# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | | |
|---|---|---|
| MICHAEL WAGGONER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 3:15-cv-00220 |
| | ) | JUDGE CRENSHAW |
| CARLEX GLASS AMERICA, LLC, | ) | |
| | ) | |
| | ) | |
| Defendant. | | |

## MEMORANDUM OPINION

Plaintiff Michael Waggoner filed this action against Defendant Carlex Glass America, LLC ("Carlex"), after it terminated Waggoner's employment. (Doc. No. 1.) Waggoner alleges that Carlex violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111 *et seq.* Before the Court is Carlex's motion for summary judgment. (Doc. No. 17.) For the following reasons, Carlex's motion is **GRANTED**.

I.  UNDISPUTED FACTS

On January 22, 2007, Waggoner began working at the Ford Glass Plant. (Doc. No. 21-1 at 7.) At the glass plant, there is a hot end and a cold end. (Id. at 8.) In the hot end, the workers smelt and melt the glass to create the glass product. (Id.) In the cold end, the workers cut the glass into sections and pack it to ship. (Id.) The company that hired Waggoner at the glass plant assigned him to work in the cold end for about a month operating the fork lift, and then moved him to the hot end. (Id.) At some point, Zeledyne, Inc. ("Zeledyne"), bought the glass plant. (Doc. No. 27 at 1.) All of the workers at the glass plant are represented by a union. (Id.)

While working for Zeledyne, there were two incidents where Waggoner had a "violent outburst" toward co-workers. (Id. at 3.) In 2009, Waggoner's supervisor sent Waggoner home after

he screamed at co-workers and cursed the control engineer, Vanesia Swafford. (Id.) In 2010, Waggoner yelled at Thomas Rucker after he asked Waggoner not to use a computer that was receiving an update. (Id.) Zeledyne suspended Waggoner for four-to-six months after the second incident. (Id.)

During his suspension, Waggoner informed Human Resources Manager Bill Kernahan about his disability—that he has bipolar disorder.[1] (Id. at 4.) Kernahan advised Waggoner to seek treatment and agreed to return Waggoner to work after treatment if Waggoner agreed to a "last chance agreement." (Id.) The agreement provided that Zeledyne would immediately discharge Waggoner if he engaged in any further outbursts. (Id.)

In April 2011, Carlex acquired the Ford Glass Plant from Zeledyne. (Id. at 1.) As part of the acquisition, Carlex agreed to hire all unionized workers employed by Zeledyne, including Waggoner. (Id.) Carlex agreed with the union on work rules prohibiting employees from "us[ing] abusive or threatening language against any other employee/visitor/contractor" or "engag[ing] in fighting acts of threat or assault." (Id.) Under the union's agreement, Carlex could only discharge Waggoner for cause. (Id.)

Carlex hired Waggoner to work on the cold end of the facility. (Id. at 4.) Waggoner worked with four other team members. (Id. at 5.) Waggoner and two team members operated the machines that made the final cuts of the glass and then packed and sealed the glass. (Id.) The other two team members operated the forklifts that removed the packaged glass and transported it to the warehouse for distribution. (Id.) The team leader, A.J. Jones, was responsible for directing the work of the group and set schedules, but did not serve as a supervisor with hiring and firing authority. (Id.) Jones and the rest of the team reported directly to Don Smith and David Cannon as supervisors.

---

[1] Although Waggoner disputes that this is the first time he informed his supervisor about his disability, that is not material to the instant motion. This is the latest that Waggoner's supervisors learned about his disability.

(Id.) Smith and Cannon reported directly to area managers Brian Demana, Cecil Qualls, and Steve Beckwith. (Id.)

In September 2011, Waggoner bid on a furnace job in the hot end of the facility. (Id. at 7.) Carlex awarded Waggoner the job, but he declined the award. (Id.) Waggoner told management that he wanted to stay in his current job to remain on day shift because the job in the hot end was on night shift. (Id.) However, his job on the cold end was already scheduled to move to night shift in the near future. (Id.) Waggoner also informed management that he did not want to work with Korron Gardner, the hot end supervisor. (Id.)

In the summer of 2013, Waggoner bid on another opening for a furnace job in the hot end of the facility. (Id. at 8.) Waggoner would not have received an increase in pay if Carlex awarded him the job. (Id.) During his interviews, Waggoner informed the management that he did not want to work with Gardner because he made Waggoner angry. (Id.) Ultimately, the management decided to award the two open positions to other employees. (Id.) Waggoner never worked with Gardner except when Waggoner volunteered to work overtime shifts. (Id. at 13; Doc. No. 21-1 at 29-30.)

During 2013, Waggoner was involved in two incidents with his team leader Jones. In April, Waggoner "yelled and screamed" at Jones when he made a change to Waggoner's break schedule, which Waggoner felt was unfair. (Id. at 9.) On September 30, Waggoner confronted Jones because he felt Jones changed the break schedule for his own personal benefit so that Jones received an extra break whereas Waggoner and another employee received one fewer. (Id. at 9-10.) Waggoner yelled and was angry, and claims that Jones antagonized him to anger him further. (Id. at 9.) Waggoner's yelling attracted a large crowd of attention. (Id. at 10.) Waggoner may have scared people, or the spectators may have just felt awkward. (Id.)

3

After Jones reported this matter to Human Resources, Kernahan promptly investigated the incident. (Id. at 10.) Kernahan interviewed Waggoner, represented by his union steward, and Jones. (Id. at 11.) Waggoner did not deny Jones's allegations, but explained that he had not been taking his medications for his bipolar disorder. (Id.) Kernahan suspended Waggoner pending the company's investigation. (Id.)

On October 2, 2013, Carlex fired Waggoner for cause. (Id.) Carlex found that Waggoner violated Work Rule Number Eight by using abusive and threatening language toward another employee. (Id.) Waggoner did not file a union grievance as a result of his discharge because he believed that his union representative was supposed to file a grievance for him. (Id.)

On May 8, 2014, Waggoner, through counsel, filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging that Carlex discriminated against him because of his disability. (Id. at 12.) Waggoner did not assert claims of retaliation or hostile work environment. (Id.) On December 1, 2014, the EEOC issued Waggoner a right to sue letter. (Id. at 13.)

II. STANDARD OF REVIEW

In reviewing a motion for summary judgment, this Court will only consider the narrow question of whether there are "genuine issues as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A motion for summary judgment requires that the Court view the "inferences to be drawn from the underlying facts . . . in light most favorable to the party opposing the motion." Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)). The opponent, however, has the burden of showing that a "rational trier of fact [could] find for the non-moving party [or] that there is a 'genuine issue for trial'" Matsushita, 475 U.S. at 587. "The

4

mere existence of a scintilla of evidence in support of plaintiff's position, however, will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, 477 U.S. 242, 252 (1986). If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. Anderson, 477 U.S. at 479-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." Hill v. White, 190 F.3d 427, 430 (6th Cir. 1999) (citing Anderson, 477 U.S. at 247-49).

III. ANALYSIS

Carlex argues that it is entitled to summary judgment on the: (1) disability discrimination claim; (2) failure to accommodate claim; (3) retaliation claim; and (4) hostile work environment claim. (Doc. No. 18.) Waggoner responds that there are disputed material facts, and a jury trial should resolve all claims. (Doc. No. 26.)

A. DISABILITY DISCRIMINATION

Carlex argues that Waggoner's disability discrimination claim should be dismissed because it is undisputed that: (1) Waggoner is not a qualified individual; (2) similarly-situated people were not treated more favorably; and (3) Waggoner cannot prove that Carlex's legitimate, non-discriminatory reason for the termination was pretext. (Doc. No. 18 at 9, 13.) Waggoner argues that: (1) he was a qualified individual; (2) similarly situated employees were treated differently; and (3) Carlex's proffered reason for termination was pretext for discrimination. (Doc. No. 26 at 8, 11, 17.) Both parties agree that Waggoner is attempting to prove discrimination using indirect evidence.

5

To prove disability discrimination using indirect evidence under the ADA, the Court uses the McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) burden-shifting framework. Monette v. Elec. Data Sys. Corp., 90 F.3d 1173, 1178 (6th Cir. 1996). "To establish a claim for disability discrimination under the indirect method, a plaintiff must first establish a *prima facie* case of discrimination by showing that (1) he or she is disabled, (2) he or she is otherwise qualified for the position, with or without reasonable accommodation, (3) he or she suffered an adverse employment decision, (4) the employer knew or had reason to know of the plaintiff's disability, and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced." Ferrari v. Ford Motor Co., --- F.3d ---, 2016 WL 3443646, at *4 (6th Cir. 2016) (citing Monette, 90 F.3d at 1178). The fifth element "may also be satisfied by showing that similarly situated non-protected employees were treated more fairly." Jones v. Potter, 488 F.3d 397, 404 (6th Cir. 2007) (quoting Talley v. Bravo Pitino Rest., Ltd., 61 F.3d 1241, 1246 (6th Cir. 1995) (overruled on other grounds)).

"Once the plaintiff establishes a *prima facie* case under the indirect method, the burden shifts back to the defendant to 'offer a legitimate explanation for its action.'" Ferrari, --- F.3d ---, 2016 WL 3443646, at *4 (quoting Monette, 90 F.3d at 1186). "If the defendant does so, the burden then shifts back to the plaintiff, who 'must introduce evidence showing that the proffered explanation is pretextual.'" Id. (quoting Monette, 90 F.3d at 1186).

1. *Qualified Individual*

Carlex claims that Waggoner was not qualified for the job because he threatened another employee. (Doc. No. 18 at 11.) Waggoner claims that he has never been a direct threat to the safety of himself or others while working for Carlex. (Doc. No. 26 at 8.)

Waggoner never posed a direct threat to any employee at Carlex. A person who is a "direct threat to the health or safety of other individuals in the workplace" is not a qualified individual under the ADA. 28 U.S.C. § 12113(b) (2009). The evidence in the record shows that Waggoner yelled and screamed at other employees to the extent that other employees may have been scared by Waggoner. However, Waggoner never threatened those employees. Contra Green v. Burton Rubber Processing, Inc., 30 Fed. Appx. 466, 470 (6th Cir. 2002) (finding that a plaintiff who threatened to kill other employees with a gun that he owns was a direct threat to other employees); Sullivan v. River Valley School Dist., 197 F.3d 804, 812-13 (6th Cir. 1999) (finding the plaintiff threatened other employees when the plaintiff told the employees, "You'll be sorry for this," and, "You will regret this . . . ."). Because the evidence in the record falls short of showing that Waggoner was a direct threat to other individuals in the work place, there is a dispute of material fact as to whether Waggoner was a qualified individual.

2. *Similarly-Situated Individuals*

Carlex argues that Waggoner cannot prove the fifth element because he cannot show that similarly situated non-protected employees were treated more fairly. (Doc. No. 18 at 11.) Waggoner attempts to use allegations in his complaint to prove that there are two similarly situated non-protected employees that were treated more fairly. (Doc. No. 26 at 11.) First, Waggoner asserts that in 2012 or 2013, Jones was only sent home for less than a day when he told an African-American employee to "get her black a** out here." (Doc. No. 1 at 5.) Additionally, in spring 2011, a non-disabled employee "showed strong symptoms of being under the influence of drugs at work: He was asleep or passed out at his work station, slumped over a chair, drooling over himself." (Id.) Manager Brian Demana's only action was to bump the employee on the shoulder as he walked by in order to attempt to wake the employee up. (Id.)

7

"In the disciplinary context, . . . to be found similarly situated, the plaintiff and his proposed comparator must have engaged in acts of 'comparable seriousness.'" Colvin v. Veterans Admin. Med. Center, 390 Fed. Appx. 454, 458 (6th Cir. 2010) (quoting Wright b. Murray Guard, 455 F.3d 702, 710 (6th Cir. 2006)). Factors for the Court to consider on whether the conduct is "similarly situated," include whether the plaintiff's comparators "(1) dealt with the same supervisor, (2) have been subject to the same standards, and (3) have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Mitchell v. Toledo Hosp., 964 F.3d 577, 583 (6th Cir. 1992).

Neither of Waggoner's proposed comparators were similarly situated to Waggoner because there is no evidence that either comparator had a history of abuse. Waggoner agreed to a "last chance agreement" with his supervisors when Zeledyne owned the plant. During his time at the plant, he had three prior instances where he yelled at another employee. The management—including Kernahan, who conducted the investigation—knew of the Waggoner's prior history and his "last chance agreement" with Zeledyne. After the "last chance agreement," Carlex gave Waggoner another chance after the April 2013 incident. While the first comparator certainly used abusive language toward the other employee, there is no evidence that Carlex treated either of the proposed comparators differently than it treated Waggoner after the April 2015 incident. Therefore, the comparators are not similarly situated to Waggoner. Because Waggoner cannot prove the fifth element of a prima facie case of discrimination, the Court grants summary judgment on this claim.

3. *Pretext*

Even if Waggoner can establish a prima facie case of discrimination, Carlex has given a legitimate non-discriminatory reason for firing him—violating Work Rule Number Eight. Carlex

8

argues that Waggoner cannot prove that this reason is pretextual. (Doc. No. 18 at 13.) Waggoner claims that the legitimate non-discriminatory reason was pretext based on exaggerations by Carlex's lawyer in the memorandum supporting his motion for summary judgment. (Doc. No. 26 at 18-19.) He does not address the reason given by Carlex.

"To survive a motion for summary judgment, a plaintiff does not definitively need to prove that the defendant's reason was pretextual, but rather 'must prove only enough to create a genuine issue as to whether the rationale is pretextual.'" Ferrari, --- F.3d ---, 2016 WL 3443646, at *7 (quoting Whitfield v. Tennessee, 639 F.3d 253, 260 (6th Cir. 2011)). A plaintiff "can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." Id. (quoting Romans v. Mich. Dep't of Human Servs., 668 F.3d 826, 839 (6th Cir. 2012)).

Here, Waggoner does not produce any evidence that a reasonable jury could doubt Carlex's stated reasons for its actions. Waggoner admitted to the conduct during the investigation, so he cannot show that the proffered reasons had no basis in fact. There is no evidence in the record to show that the proffered reason did not actually motivate Carlex's action. Finally, Work Rule Number Eight makes the abusive language cause for termination, so Waggoner cannot show that it is insufficient to motivate Carlex's action. Waggoner does not create a genuine issue as to whether Carlex's rationale is pretextual, and the Court would grant summary judgment on this claim even if it found that Waggoner made a prima facie case of discrimination.

B. FAILURE TO ACCOMMODATE

Carlex argues that it is entitled to summary judgment on Waggoner's failure to accommodate claim because he never requested an accommodation from Carlex. (Doc. No. 18 at

9

16.) Waggoner asserts that Carlex failed to accommodate his disability by "not promoting or transferring him to another department or by not otherwise moving other employees with whom he had conflict into other jobs or shifts." (Doc. No. 26 at 14.) He claims that, although he did not phrase it as a request for an accommodation, he told Carlex about his disability and complained about certain employees, and that is sufficient notice to Carlex that it should have started the interactive process as to a reasonable accommodation. (Id.)

Generally, "it is the responsibility of the individual with a disability to inform the employer than an accommodation is needed." Gantt v. Wilson Sporting Goods Co., 143 F.3d 1042, 1046 (6th Cir. 1998) (quoting 29 C.F.R. pt. 1630 App § 1630.9). "Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation." Id.

Here, there is no evidence that Waggoner requested an accommodation. While he applied for the two jobs at the hot end, there is no evidence in the record that he told Carlex that he was applying for those jobs to avoid someone that exasperated his bipolar disorder. In fact, the record shows that the only person Waggoner told Carlex that he did not want to work with was Gardner, and Gardner supervised one of the jobs at the hot end. Carlex never made Waggoner work with Gardner unless Waggoner volunteered to work overtime. Based on the evidence before the Court, Waggoner did not inform Carlex that he needed an accommodation, and the Court grants summary judgment on the failure to accommodate claim.

C.  REMAINING CLAIMS

Carlex argues that Waggoner's retaliation and hostile work environment claims should be dismissed for failure to exhaust his administrative remedies. (Doc. No. 18 at 18.) Waggoner claims that Carlex retaliated against him for requesting an accommodation by rejecting his requested

10

transfer to the hot end. (Doc. No. 1.) Waggoner also claims that he was harassed based on his disability. (Id.) He asserts that these claims should not be dismissed because they are reasonably within the scope of the charge filed. (Doc. No. 26 at 19.)

Generally, a plaintiff "must file a charge with the EEOC and receive a right-to-sue letter before commencing litigation." Johnson v. Cleveland City School Dist., 344 Fed. Appx. 104, 110 (6th Cir. 2009). A charge must "identify the parties[ ] and . . . describe generally the action or practices complained of." Id. (quoting 29 C.F.R. § 1601.12(b). "Liberal construction [of the EEOC charge] is not necessary where the claimant is aided by counsel in preparing his charge." Ang v. Procter & Gamble Co., 932 F.2d 540, 546 (6th Cir. 1991) (reversed on other grounds). Still, at times, a broad reading of an EEOC complaint may be appropriate in cases where the plaintiff has counsel. Cleveland Branch, N.A.A.C.P. v. City of Parma, OH, 263 F.3d 513 (6th Cir. 2001). The plaintiff may only present claims raised in the EEOC charge or claims "reasonably expected to grow out of the charge of discrimination." Id. at 534 (quoting Davis v. Sodexho, Cumberland Coll. Cafeteria, 157 F.3d 460, 463 (6th Cir. 1998)).

Here, the retaliation and hostile work environment claims are not "reasonably expected" to grow out of the ADA discrimination or failure to accommodate claim. The only facts that Waggoner alleged in his EEOC complaint—which he prepared with the assistance of counsel—are that he has a disability, requested a reasonable accommodation, and the company discharged him.[2] (Doc. No. 21-1 at 116.) He told the EEOC that he believed he was discriminated against because of his disability. (Id.) A retaliation or hostile work environment claim is not "reasonably

---

[2] Based on these facts, a claim where Waggoner asserts that Carlex discharged him in retaliation for asking for a reasonable accommodation could reasonably be expected to grow out of the EEOC charge. However, as the Court has already found that Waggoner did not request a reasonable accommodation, this claim would fail on its merits.

11

expected" to grow out of these facts. Therefore, the Court grants Carlex summary judgment on these claims because Waggoner failed to exhaust his administrative remedies.

IV. CONCLUSION

For the foregoing reasons, Carlex's motion for summary judgment (Doc. No. 17) is **GRANTED**.

The Court will file an appropriate order.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE